UNITED STATES DISTRICT COURT
DISTRICT OF MARYLAND
NORTHERN DIVISION

---

TYLER ROBERT PANG,
409 Melrose Avenue
Middlesex, NJ 08846

                              Plaintiff,

v.                                           CASE NO.: 1:20-cv-122

CREDIT PLUS, INC.,                      **JURY TRIAL DEMANDED**
31550 Winterplace Parkway
Salisbury, MD 21804

                              Defendant.

---

## COMPLAINT

Tyler Robert Pang ("Plaintiff" or "Mr. Pang"), who is a living, breathing, 29 year-old consumer, brings this Complaint against Credit Plus, Inc. ("Credit Plus" or "Defendant"), and in support of his claims, he states as follows:

## INTRODUCTION

1. The computerization of our society has resulted in a revolutionary increase in the accumulation and processing of data concerning individual American consumers. Data technology, whether it is used by businesses, banks, the Internal Revenue Service or other institutions, allows information concerning individual consumers to flow instantaneously to requesting parties. Such timely information is intended to lead to faster and better decision-making by its recipients and, in theory, all of society should ultimately benefit from the resulting convenience and efficiency.

2. However, unfortunately this information has also become readily available for, and subject to, mishandling and misuse. Individual consumers can and do sustain substantial damage,

1

both economically and emotionally, whenever inaccurate or fraudulent information is disseminated and/or obtained about them.

3. The ongoing technological advances in the area of data processing have resulted in a boon for the companies that accumulate and sell data concerning individuals' credit histories and other personal information. Such companies are commonly known as consumer reporting agencies ("CRAs").

4. The three major national CRAs are Equifax Information Services, LLC ("Equifax"), Experian Information Solutions, Inc. ("Experian"), and Trans Union, LLC ("Trans Union").

5. These CRAs sell credit information to readily paying subscribers (i.e., retailers, landlords, lenders, potential employers, and other similar interested parties), commonly called "consumer reports," concerning individuals who may be applying for retail credit, housing, employment, or a car or mortgage loan.

6. These CRAs also sell credit information to "resellers" of consumer reports, like Defendant Credit Plus, who assemble and merge the credit information obtained from the CRAs into a 3-bureau credit report, also known as a "tri-merge" or "merged infile" credit report, and sell them to various mortgage lenders throughout the country.

7. Tri-merge credit reports are unique to the mortgage industry because applying for a mortgage loan is different in many ways from applying for other types of loans.

8. Since 1970, when Congress enacted the Fair Credit Reporting Act, 15 U.S.C. § 1681, *et seq.* ("FCRA"), federal law has required CRAs and resellers to implement and utilize reasonable procedures "to assure maximum possible accuracy" of the personal, private, and financial information that they compile, assemble, merge, and sell about individual consumers.

9. One of the primary purposes in requiring CRAs and resellers to assure "maximum possible accuracy" of consumer information is to ensure the stability of our banking system:

> The banking system is dependent upon fair and accurate credit reporting. Inaccurate credit reports directly impair the efficiency of the banking system, and unfair credit reporting methods undermine the public confidence which is essential to the continued functioning of the banking system.

*See* 15 U.S.C. § 1681(a)(1).

10. The preservation of one's good name and reputation is also at the heart of the FCRA's purposes:

> [W]ith the trend toward computerization of billings and the establishment of all sorts of computerized data banks, the individual is in great danger of having his life and character reduced to impersonal "blips" and key-punch holes in a stolid and unthinking machine which can literally ruin his reputation without cause, and make him unemployable or uninsurable, as well as *deny him the opportunity to obtain a mortgage or buy a home. We are not nearly as much concerned over the possible mistaken turn-down of a consumer for a luxury item as we are over the possible destruction of his good name without his knowledge and without reason. * * * [A]s Shakespeare said, the loss of one's good name is beyond price and makes one poor indeed* (emphasis added).

*Bryant v. TRW, Inc.*, 689 F.2d 72, 79 (6th Cir. 1982) [quoting 116 Cong. Rec. 36570 (1970)].

11. In light of these important findings and purposes, Congress specifically noted "a need to insure that [CRAs] exercise their grave responsibilities with fairness, impartiality, and respect for the consumer's right to privacy." *See* 15 U.S.C. § 1681(a)(4).

12. This action seeks actual, statutory, and punitive damages, costs and attorneys' fees for Plaintiff against Defendant Credit Plus for its willful and/or negligent violations of the Fair Credit Reporting Act, 15 U.S.C. §§ 1681, *et seq.*, as described herein.

## THE PARTIES

13. Plaintiff Tyler Robert Pang ("Plaintiff" or "Mr. Pang") is a natural person who resides in the City of Middlesex, State of New Jersey, and is a "consumer" as that term is defined in 15 U.S.C. § 1681a(c).

14. Defendant Credit Plus, Inc. ("Credit Plus" or "Defendant") is a foreign limited liability company that does business throughout the country and regularly conducts business in the State of Maryland.

15. Credit Plus is a "consumer reporting agency" as defined in 15 U.S.C. § 1681a(f). Credit Plus is regularly engaged in the business of assembling, evaluating, and disseminating information concerning consumers for the purpose of furnishing consumer reports, as defined in 15 U.S.C. § 1681a(d) to third parties.

16. Credit Plus is also a "reseller" as defined at 15 U.S.C. § 1681a(u), which is a "consumer reporting agency that—(1) assembles and merges information contained in the database of another consumer reporting agency or multiple consumer reporting agencies concerning any consumer for purposes of furnishing such information to any third party, to the extent of such activities; and (2) does not maintain a database of the assembled or merged information from which new consumer reports are produced."

## JURISDICTION AND VENUE

17. This Court has jurisdiction over Plaintiff's claims pursuant to 28 U.S.C. § 1331 and 15 U.S.C. § 1681p, which allows claims under the FCRA to be brought in any appropriate court of competent jurisdiction.

18. Venue is proper in this District pursuant to 28 U.S.C. § 1391(b)(2) because a substantial part of the events or omissions giving rise to the claims occurred in this District.

# FACTS

## Credit Plus's Process of Assembling and Merging Consumers' Credit Information into Merged Infile Credit Reports

19. The CRAs, mainly Equifax, Experian, and Trans Union, regularly receive information from various sources around the country including banks, credit unions, automobile dealers, student loan providers, public information vendors, the Social Security Administration, and others.

20. These sources are known as "furnishers" within the credit reporting industry and under the FCRA because they furnish information relating to consumers to one or more consumer reporting agencies for inclusion in a consumer report. *See* 12 CFR § 1022.41.

21. The CRAs collect information from thousands of furnishers and distribute that information to its many subscribers, including Credit Plus.

22. The CRAs' subscribers use the information to make decisions as to whether to extend credit to a particular consumer and for other purposes permitted under the FCRA.

23. The process by which the CRAs receive, sort, and store information is largely electronic.

24. Furnishers report credit, public record, and other information to the CRAs through the use of coded tapes that are transmitted to the CRAs on a monthly basis through software known as Metro 2.

25. The CRAs take the credit, public record, and other information reported by furnishers and use it to create consumer credit files.

26. The CRAs maintain credit files on more than 200 million consumers.

27. Credit files are updated electronically by the furnishers to reflect new information regarding the reported accounts (sometimes referred to as "tradelines" within the industry), public records, and other information.

28. The CRAs match tradelines and public records to a consumer credit file by comparing the information about the consumer associated with the tradeline or public record to the information they maintain about the consumer in the consumer's credit file or files.

29. The CRAs accomplish this matching of credit information to consumer credit files through the use of certain matching algorithms or database rules.

30. Sometimes the CRAs' matching algorithms match information belonging to one consumer to the credit file of another consumer; resulting in what is commonly known in the industry as a "mixed" or "merged" credit file.

31. Mixed credit files are not a new phenomenon. In fact, as long ago as the early 1990s, the Federal Trade Commission ("FTC") (the government agency charged with enforcement of the FCRA), entered into individual Consent Decrees with each of the major CRAs regarding their significant failures and deficiencies with respect to mixed credit files.

32. Credit Plus, a reseller of credit information obtained from the CRAs, is well aware of the mixed credit file issue because it often times requests from the CRAs the credit information pertaining to a particular consumer but receives credit information from the CRAs that belongs to an entirely different consumer.

33. When Credit Plus requests credit information from the CRAs for a particular consumer, the credit information is exchanged via an automated process, and the CRAs send the raw credit data to Credit Plus electronically.

34. After receiving the raw credit data from the CRAs for a particular consumer, Credit Plus assembles, merges, and normalizes the credit information, exactly as received from Equifax, Experian, and Trans Union, into a Merged Infile credit report.

35. As far as Credit Plus is concerned, accuracy means outputting the same credit data that it received from the CRAs without alteration.

36. Credit Plus does nothing to ensure that the credit information is, in fact, accurate, or that it belongs to the consumer that is the subject of the Merged Infile credit report.

37. Credit Plus does not analyze the accuracy of the underlying credit data it receives from the CRAs in any way but merely accepts it at face value.

38. Credit Plus does not employ reasonable procedures to assure the maximum possible accuracy of the credit information it includes in the Merged Infile credit reports it sells to mortgage lenders throughout the country.

**Credit Plus's Practices Concerning the Sale of Reports on the "Deceased"**

39. Credit Plus sells millions of consumer reports, also known as Merged Infile credit reports, each year, and also sells credit scores.

40. Credit Plus sells or resells Merged Infile credit reports and credit scores to various markets, including but not limited to the mortgage financing and lending industry.

41. Pursuant to 15 U.S.C. § 1681e(b), consumer reporting agencies and resellers, like Credit Plus, are required "to follow reasonable procedures to assure maximum possible accuracy of the information concerning the individual about whom the report relates."

42. Pursuant to 15 U.S.C. §§ 1681b and 1681e(a), consumer reporting agencies, like Credit Plus, must maintain reasonable procedures to assure that reports are sold only for legitimate "permissible purposes."

43. Credit Plus routinely sell credit reports for living consumers with active credit histories, which include a notation indicating that the living consumer is "deceased" and does not have a credit score.

44. Credit Plus does not independently verify with any source that a consumer is, in fact, deceased before placing a "deceased" notation on that consumer's Merged Infile credit report.

45. Credit Plus does not employ any procedures *at all* to assure that a consumer with a "deceased" notation on his/her Merged Infile credit report is, in fact, actually deceased before including the "deceased" notation on that consumer's report and selling that report for profit.

46. Even in instances where other data on the face of the consumer's Merged Infile report indicates that he/she is not deceased, such as current and active credit history, Credit Plus employs no procedures to assure that a consumer with a "deceased" notation on his/her report is, in fact, actually deceased before including the "deceased" notation in that consumer's file.

47. Credit Plus also has no procedures to ensure that a consumer with a "deceased" mark on his/her report is actually deceased before including the "deceased" notation on that consumer's report—even in instances where the purportedly deceased consumer communicates directly with Credit Plus.

48. Once a "deceased" notation is included in a consumer's report, Credit Plus will not calculate and will not provide a credit score for that consumer.

49. Instead, when Credit Plus sells a report with a "deceased" notation to a third party, it reports that consumer's credit score as "N/A."

50. Credit Plus knows that third-party credit issuers require a credit score in order to process a given credit application.

8

51. Credit Plus also knows that consumers without credit scores are unable to secure any credit from most credit issuers.

52. Credit Plus also knows that living consumers are routinely turned down for credit specifically because it is reporting them as "deceased" and without a credit score.

53. Credit Plus has been put on notice for years through consumer disputes and lawsuits that living, breathing consumers are turned down for credit specifically because Credit Plus is reporting them as "deceased" and without a credit score.

54. Credit Plus has received and documented many disputes from consumers complaining that their Merged Infile credit report had them erroneously marked as "deceased."

55. Nevertheless, Credit Plus has an automated process in place that accepts all credit data received from the CRAs as accurate and employs no procedures to assure that a consumer marked as "deceased" on their Merged Infile credit report is, in fact, deceased.

56. Credit Plus has no independent procedure to change an erroneous deceased status on its own and will merely parrot the credit information it receives from the national CRAs, including Equifax, Experian, and Trans Union.

57. Credit Plus charges third parties a fee for reports with a mark that a consumer is deceased ("reports on the deceased") just as they would for any other report.

58. Credit Plus profits from the sale of reports on deceased consumers.

59. Credit Plus knows that truly deceased consumers do not apply for credit.

60. Credit Plus knows that the credit information and reports of truly deceased persons are used by criminals to commit identity theft or credit fraud. Indeed, identity theft using the personal identifying information of deceased consumers is known to Credit Plus to be a common and major source of identity theft.

61. Credit Plus knows that identity theft and credit fraud are serious and widespread problems in our society.

62. Credit Plus sells reports on supposedly deceased consumers to third parties in an automated fashion and without any specific or general certification that could reasonably explain a "permissible purpose" for purchasing or using a (supposedly) deceased consumer's credit history and/or report.

63. For consumers who are deceased, there rarely, if ever, exists a permissible purpose under the FCRA for Credit Plus to sell their credit reports, absent a court order.

64. Credit Plus knows that such reports contain a vast amount of personal identifying and credit account information on the supposedly deceased consumer, information that can be used to commit identity theft or for other fraudulent purposes.

### Mr. and Mrs. Pang Begin Their Home Search in January 2018

65. In or about January 2018, Mr. and Mrs. Pang began looking to purchase a home in the greater Middlesex, New Jersey area.

### Mr. and Mrs. Pang's First Attempt to Obtain a Home Mortgage Loan with GMH Mortgage Services in January 2018

66. In mid-January 2018, Mr. Pang and his wife, Megan Pang ("Mrs. Pang"), began working with Bob Kraly ("Mr. Kraly") at GMH Mortgage Services, LLC ("GMH Mortgage") to get pre-approved for a Conventional or FHA home mortgage loan.

67. Mr. Kraly obtained all of Mr. and Mrs. Pang's personal identification information, including their accurate Social Security numbers, and informed them that he needed to obtain their credit reports from Equifax, Experian, and Trans Union in order to determine if he could pre-approve them for a home mortgage loan.

68. On January 22, 2018, Credit Plus purchased Mr. and Mrs. Pang's credit files from Equifax, Experian, and Trans Union and assembled and merged their credit information into a Merged Infile credit report, which it sold to GMH Mortgage.

69. Much to Mr. and Mrs. Pang's shock and dismay, their pre-approval was halted by GMH Mortgage because Mr. Pang's Merged Infile credit report indicated the following:

TRANSUNION/FICO CLASSIC (04)

SCORE: **N/A**

SC2 – FILE NOT SCORED BECAUSE SUBJECT IS DECEASED

70. Both Experian and Equifax provided Credit Plus with a credit score for Mr. Pang while Trans Union reported no credit score for Mr. Pang, stating that his credit file was not scored because he was deceased.

71. The Merged Infile credit report that Credit Plus sold to GMH Mortgage was patently inconsistent—it contained Mr. Pang's Experian and Equifax credit scores but did not contain a credit score from Trans Union and, instead, stated that his credit file was not scored because he was deceased.

72. Mr. Pang was excited to make his first home purchase, but his excitement was suddenly and unexpectedly stymied when he received a telephone call from Mr. Kraly stating that there was a "problem" with his credit.

73. Mr. Pang takes great pride in his good name and established credit rating, so he works hard to ensure that his bills are paid in-full and on-time every month. He believes and understands that his credit record with all of his creditors is excellent, so Mr. Pang could not imagine what the problem could be.

11

74. Much to Mr. Pang's shock and dismay, his financing was halted by GMH Mortgage because Mr. Pang's Merged Infile credit report indicated that he was "deceased" and had no Trans Union credit score.

75. Mr. Kraly informed Mr. Pang that he would need to try and remedy this issue before they could move forward with financing because the FHA Underwriting Guidelines require that a full credit report be available, i.e., scores from all three credit bureaus, and that suppressed information must be resolved by the borrower prior to underwriting the loan.

76. Between January 2018 and April 2019, Mr. Pang made numerous attempts to correct the deceased notation included in his Trans Union credit file via telephonic and written dispute letters to Trans Union, to no avail.

**Mr. and Mrs. Pang's Second Attempt to Obtain a Home Mortgage Loan with GMH Mortgage Services in April 2019**

77. In or about early April 2019, Mr. and Mrs. Pang once again began looking at homes in the greater Middlesex, New Jersey area.

78. In or about mid-April 2019, Mr. and Mrs. Pang found a home for sale in Middlesex, New Jersey ("the Middlesex property") that suited their needs.

79. The Middlesex property was listed for sale at $247,000.00, and they were unable to negotiate the price down.

80. In or about late April 2019, Mr. and Mrs. Pang began working again with Mr. Kraly at GMH Mortgage to obtain financing for a home mortgage loan on the Middlesex property.

81. On April 26, 2019, Credit Plus purchased Mr. and Mrs. Pang's credit files from Equifax, Experian, and Trans Union and assembled and merged their credit information into a Merged Infile credit report, which it sold to GMH Mortgage.

82. Much to Mr. and Mrs. Pang's shock and dismay, their pre-approval was once again halted by GMH Mortgage because Mr. Pang's Merged Infile credit report indicated the following:

TRANSUNION/FICO CLASSIC (04)

SCORE: **N/A**

SC2 – FILE NOT SCORED BECAUSE SUBJECT IS DECEASED

83. Both Experian and Equifax provided Credit Plus with a credit score for Mr. Pang while Trans Union reported no credit score for Mr. Pang, stating that his credit file was not scored because he was deceased.

84. The Merged Infile credit report that Credit Plus sold to GMH Mortgage was patently inconsistent—it contained Mr. Pang's Experian and Equifax credit scores but did not contain a credit score from Trans Union and, instead, stated that his credit file was not scored because he was deceased.

85. Mr. Pang's excitement to purchase a home was again stymied when he received a telephone call from Mr. Kraly stating, once again, that there was still a "problem" with his credit.

86. Mr. Pang's financing was halted again by GMH Mortgage because of the "deceased" notation on his credit report and lack of a Trans Union credit score.

87. Mr. Kraly again informed Mr. Pang that the deceased notation needed to be removed before they could move forward with financing due to the FHA Underwriting Guidelines.

88. Mr. Pang immediately explained to Mr. Kraly that Trans Union's "deceased" notation had been a continuing problem and that he had recently sent a very detailed written dispute with supporting documentation to Trans Union on March 21, 2019. Mr. Pang pleaded with Mr. Kraly to be patient with him while he waited for Trans Union to reinvestigate his dispute and delete

the "deceased" notation from his Trans Union credit file. Mr. Pang promised Mr. Kraly that he would get back to him as soon as he had an update from Trans Union.

89. Mr. Pang was frustrated, confused, and angry that this obviously false information remained linked to him despite his previous disputes to Trans Union, and that Credit Plus's inaccurate reporting continued to prevent him from benefiting from his good credit and obtaining new credit.

90. As a result of the "deceased" notation, Credit Plus made it practically impossible for Mr. Pang to obtain credit.

91. At all times pertinent hereto, Credit Plus was acting by and through its agents, servants, and/or employees who were acting within the course and scope of their agency or employment, and under the direct supervision and control of Credit Plus.

92. At all times pertinent hereto, Credit Plus's conduct, as well as that of its agents, servants, and/or employees, was intentional, willful, reckless, and in grossly negligent disregard for federal law and the Plaintiff's rights.

93. Plaintiff has applied for and has been denied various loans on multiple occasions, and Plaintiff has been informed that the basis for these denials was the inaccurate information that appears on Plaintiff's Merged Infile credit reports, prepared by Credit Plus, and that the inaccurate information was a substantial factor for those denials.

94. As a result of Defendant's conduct, Plaintiff has suffered actual damages and serious financial and pecuniary harm arising from monetary losses relating to credit denials, loss of use of funds, loss of credit and loan opportunities, out-of-pocket expenses, and other related costs.

95. As a result of Defendant's conduct, Plaintiff has suffered great physical, emotional, and mental pain and anguish, and Plaintiff will continue to suffer the same for an indefinite time in the future, all to Plaintiff's great detriment and loss.

96. As a result of Defendant's conduct, Plaintiff has suffered actual damages in the form of financial and dignitary harm arising from the injury to credit rating and reputation.

## CLAIMS FOR RELIEF

### COUNT I
### 15 U.S.C. § 1681e(b)
### Failure to Follow Reasonable Procedures to Assure Maximum Possible Accuracy

97. Plaintiff re-alleges and incorporates the allegations set forth in paragraphs 1-96 as if fully stated herein.

98. The FCRA mandates that "[w]henever a consumer reporting agency prepares a consumer report it shall follow reasonable procedures to assure maximum possible accuracy of the information concerning the individual about whom the report relates." 15 U.S.C. § 1681e(b).

99. On at least two occasions, Defendant prepared a patently false consumer report concerning Plaintiff.

100. On at least two occasions, Defendant assembled, merged, and resold patently false consumer reports concerning Plaintiff.

101. Despite actual and implied knowledge that Plaintiff is not dead, Defendant readily sold such false reports to one or more third parties, thereby misrepresenting Plaintiff, and ultimately, Plaintiff's creditworthiness.

102. Defendant violated 15 U.S.C. § 1681e(b) by failing to establish or to follow reasonable procedures to assure maximum possible accuracy in the preparation of the credit reports and credit files it published and maintains concerning Plaintiff.

103. As a result of Defendant's conduct, action, and inaction, Plaintiff suffered damage by loss of credit; loss of the ability to purchase and benefit from his credit; the expenditure of time and money disputing and trying to correct the inaccurate credit reporting; and emotional distress including the mental and emotional pain, anguish, humiliation, and embarrassment of credit denials.

104. Defendant's conduct, action, and inaction was willful, rendering it liable for actual or statutory damages, and punitive damages in an amount to be determined by the Court pursuant to 15 U.S.C. § 1681n. In the alternative, it was negligent, entitling Plaintiff to recover under 15 U.S.C. § 1681o.

105. Plaintiff is entitled to recover attorneys' fees and costs from Defendant in an amount to be determined by the Court pursuant to 15 U.S.C. § 1681n and/or § 1681o.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiff prays for relief as follows:

a) Determining that Defendant negligently and/or willfully violated the FCRA;

b) Awarding Plaintiff actual damages, statutory, and punitive damages as provided by the FCRA;

c) Awarding Plaintiff reasonable attorneys' fees and costs as provided by the FCRA; and

d) Granting further relief, in law or equity, as this Court may deem appropriate and just.

## DEMAND FOR JURY TRIAL

106. Plaintiff demands a trial by jury.

Dated: January 15, 2020

/s/ *Kristi C. Kelly*
Kristi C. Kelly (No.  07244)
KELLY GUZZO, PLC
3925 Chain Bridge Road, Suite 202
Fairfax, VA 22030
Telephone: (703) 424-7572
Facsimile : (703) 591-0167
Email: kkelly@kellyguzzo.com

Hans W. Lodge, MN Bar No. 0397012 *
hlodge@bm.net
BERGER MONTAGUE PC
43 SE Main Street, Suite 505
Minneapolis, MN 55414
Telephone: (612) 607-7794
Fax: (612) 584-4470
**Pro hac vice* application forthcoming*

*ATTORNEYS FOR PLAINTIFF*